IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Tyrence Downey, (24754-057), ) | |
| ) | |
| Petitioner, ) | |
| ) | Case No. 21 C 50196 |
| v. ) | |
| ) | Hon. Iain D. Johnston |
| ) | |
| Andrew Ciolli, Warden, USP Thomson, ) | |
| ) | |
| Respondent. ) | |

### MEMORANDUM OPINION AND ORDER

Petitioner Tyrence Downey, an inmate at USP Canaan, brings a *pro se* habeas corpus petition pursuant to 28 U.S.C. § 2241 challenging the revocation of his good conduct credit arising out of two disciplinary incidents at USP Victorville.[1] For the following reasons, the Court denies the habeas corpus petition.

---

1 Petitioner filed the instant petition when he was incarcerated at USP Thomson, a prison in this District, and he properly named his warden at that time, Andrew Ciolli. (Dkt. 1-1). He is now incarcerated at USP Canaan, a federal prison in Pennsylvania. "[W]hen the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." *Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004) (citing *Ex Parte Endo*, 323 U.S. 283 (1944)); *see also In* re *Hall*, 988 F.3d 376, 379 (7th Cir. 2021). The Seventh Circuit in *Hall* stated that "there is a respondent within the jurisdiction of the original court that has the authority to comply with any order that may issue" because "the Bureau can take any necessary action here." *Hall*, 988 F.3d at 379. Which party to substitute in place of USP Thomson's warden is difficult in this case since it appears that the Bureau's Central Office, which oversees Thomson, is located in Kansas City, Kansas, outside of this Court's jurisdiction. But, the Court need not venture into the question of identifying the proper Bureau official with authority over Petitioner's custody and within the Court's jurisdiction as the Court is denying the habeas corpus petition. Moreover, although this case involves a disciplinary incident at USP Victorville, a federal prison in California, and as mentioned above, Petitioner is now incarcerated in Pennsylvania, this case is properly before this Court because Petitioner filed it while incarcerated at USP Thomson in this District. *Rumsfel*d, 542 U.S. at 441; *Hall*, 988 F.3d at 379.

The habeas corpus petition challenged four separate disciplinary incidents at USP Victorville.[2] Petitioner labeled those incidents: 973889, 1006342, 1014054, and 1053558.[3] The Court's screening order originally limited this case to a single claim that prison officials failed to properly preserve and allow Petitioner to review a videorecording from a surveillance camera that allegedly recorded the 1053558 incident. (Dkt. 15.) Petitioner's claims regarding the other three incidents were dismissed at the initial review stage. *Id.*

In response, Petitioner wrote to the Court explaining that the screening order misunderstood one of his claims as he was also raising a claim regarding the alleged failure to preserve and review the videorecording from the surveillance camera in his 973889 incident. (Dkt. 19.) The Court responded that Petitioner's habeas corpus petition did not raise a videorecording-based claim regarding the 973889 incident, but allowed him to submit a supplemental filing raising

---

[2] Although this case is brought under 28 U.S.C. § 2241, the Court is permitted to apply the Rules Governing Section 2254 Cases in the United States District Courts to the instant action. *See* Rule 1(b) (allowing application of rules to non § 2254 habeas corpus cases); *Poe v. United States*, 468 F.3d 473, 477 n.6 (7th Cir. 2006). Pursuant to Rule 12 of the Habeas Rules, the Federal Rules of Civil Procedure are applicable to this case to the extent that they are not inconsistent with the Habeas Rules. Although Petitioner has raised claims regarding unrelated incidents, this is acceptable because there is a single Respondent in this case. *See George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) (explaining that the Federal Rules of Civil Procedure allow joinder of unrelated claims against a single party in the same suit). Habeas Rule 2(e) is the only portion of the habeas rules discussing joinder. Under the Habeas Rules, a prisoner can challenge multiple state court judgments in the same habeas corpus petition as long as they arise from the same state court. The Rule would suggest that challenges from different state courts cannot be joined. But, Rule 2(e), by its plain language, is inapplicable to this case as there is no state court judgment being challenged in this case.

[3] Respondent explains that the numbers used by Petitioner to identify his incidents are the "administrative remedy number" associated with administrative appeal. (Dkt. 17, pg. 1.) Respondent identifies the incidents using a different number of the number assigned to the original incident report. *Id.* The nomenclature question of whether the incidents are identified via the administrative remedy number or incident report number is irrelevant to the Court's consideration of the habeas corpus petition as it is clear that the parties are discussing the same matters. The Court shall use the administrative remedy number as that was presented by Petitioner in his original petition, and used by the Court in its screening orders. (Dkt. 1, 15, 20.) The Court appreciates Respondent's point that the incident report number is properly a better number of use as it identifies the incident instead of the associated appeal from the incident, but the Court believes that transiting from one numbering system to another midstream in a case adds an unnecessary level of complexity to the case.

such a claim. The parties have briefed the claims for both incidents making this matter ready for the Court's resolution. (Dkt. 17, 22-25.)

**Incident 973889[4]**

This incident occurred on January 7, 2019,[5] at approximately 1:25 p.m., at USP Victorville. (Dkt. 24, pg. 71.) Petitioner, along with other inmates, were being moved through a sallyport on the 5A Unit in the prison. *Id*. A female correctional officer was in the sallyport participating in the prisoner movement. *Id*. The officer reported that Petitioner stopped in front of her, leered in a sexual manner, stared into her eyes followed by having his eyes wander up and down her body, and finally licked his lips in an inappropriate manner. *Id*. In response, Petitioner was charged with interfering with a staff member's performance of her duties and making a sexual proposal or threat. *Id*. at 66.

Despite the incident occurring on January 7th, the incident report is dated January 31, 2019, and was provided to Petitioner that same day. *Id*. at 71. Petitioner alleges that correctional officials at USP Victorville engage in "kickbacks" when it comes to producing incident reports. (Dkt. 25, pg. 5.) A "kickback" in this context is a delay in the creation of the incident report to allow the upcoming hearing officer and correctional officer to coordinate their understandings and conform what is ultimately put into the incident report. *Id*. The effect of the "kickback" also allowed for the deletion of the videorecorded evidence of the incident, according to Petitioner. Petitioner

---

4 Respondent refers to this incident as 3210426.

5 The Disciplinary Hearing Report states that the incident occurred on January 17, 2019. (Dkt. 24, pg. 66.) However, the incident report states the incident occurred on January 7, 2019. (Dkt. 24, pg. 71.) The Court understands the incident occurred on January 7th and believes the January 17th date to be a typo.

believes the videorecording would have shown that the correctional officer's report was a complete fabrication as he claims he was not at the unit at the time of the incident. *Id*.

Petitioner requested the videorecording be reviewed when he received the incident report on January 31st. (Dkt. 24, pg. 71.) However, there was no videorecording to review when the charges against Petitioner were heard at the disciplinary proceeding on February 27, 2019. *Id*. at 66. The videorecording has been deleted. The hearing officer, Dan Godwin, tenders a declaration in this case under 28 U.S.C. § 1746 attempting to explain the videorecording situation. *Id*. at 8.

According to Godwin, the general practice at the prison is for a surveillance camera videorecording to be available for approximately 14 days. *Id*. at 9. He does not explain why there is a 14-day limit (for example, is it a storage or cost-savings issue), only that the practice is 14-day availability. *Id*. The prison, according to Godwin, automatically preserves a videorecording as a matter of course from very serious incidents like fighting, serious assaults, and homicides, but this incident was apparently considered a minor one that did not require the automatic videorecording preservation.[6] *Id*. The incident report shows that Petitioner requested the videorecording to be reviewed when he received the report on January 31st, 24 days after the incident. *Id*. at 71.

There is also the issue of why the incident report was not issued until January 31st, despite the incident occurring on January 7th. Godwin explains that BOP policy is that the incident report should be issued within five days of the incident, but can be delayed as the matter was being investigated by a correctional lieutenant to determine if Petitioner had been properly charged. *Id*. at 9. But again, Godwin never explains the reasons for the delay.

---

6 Assuming this incident is "minor," one might reasonably wonder by the BOP considered it sufficient to warrant discipline. And assuming the incident occurred, one might wonder how the female officer feels about the incident being considered "minor."

4

Godwin references Bureau of Prisons Program Statement 5270.09, *Inmate Disciplinary Program*, that he attached to his declaration. His explanation is inconsistent with the procedures set forth by Program Statement 5270.09. Under the statement, a staff member who believes the inmate has committed a prohibited act will issue the incident report and the inmate will "ordinarily receive" the incident report within 24 hours of the incident. *Id*. at 27.

Following the incident report's issuance, a supervisory official such as a lieutenant is appointed by the warden to investigate the alleged misconduct. *Id*. at 28. The investigating official is "ordinarily appointed within 24 hours of the incident report. The investigation should be finished within 24 hours after the appointment." *Id*.

The program statement is not written in mandatory language. It says "ordinarily." The incident report is "ordinarily" issued within 24 hours of the incident, and the investigating official is "ordinarily" appointed within 24 hours of the incident report. Regardless, the timeline set forth by the program statement as the ordinary course of business suggests a 72-hour turnaround from the incident's occurrence with the incident report being issued within 24 hours, the appointment of the investigating official 24 hours after that, and the completion of the investigation in the final 24 hours. Again, why a now considered "minor" incident was not handled as "ordinary" is not explained.

Equally, the program statement suggests that the incident report from the staff member should be issued immediately after the incident and is not suspended until the investigation is complete. Yet, per Godwin, no incident report was issued until the investigation was completed, meaning that the female correctional officer did not issue the incident report to Petitioner until January 31st, 24 days after the incident. *Id*. at 71. This 24-day period for the issuance of the

5

incident report was beyond the 14-day period that the prison purportedly kept any videorecording from the incident. This delay in issuing the report is what Petitioner is calling the "kickback" process.

The incident report led to a Unit Disciplinary Committee hearing on February 12, 2019, and, in turn, notice issued to Petitioner of the formal disciplinary hearing that Godwin conducted on February 27, 2019. *Id*. at 9. That formal hearing on February 27th resulted in the disciplinary finding and revocation of good conduct that is being challenged in this claim. *Id*. at 66.

Petitioner suggests that this was a case of mistaken identity, and he was away from the area at the time of the incident. *Id*. at 72. He notes both the surveillance videorecording and that inmates must scan their ID with the metal detector that is used when entering their tier through the sallyport. *Id*. He believes there should be an electronic record from the metal detector demonstrating he was not present at that time. Petitioner also identifies two fellow inmates named Godette and Rice as alibi witnesses. *Id*.

The issue of the videorecording was addressed at the disciplinary hearing with both Godwin and Petitioner's requested staff representative agreeing that there was no videorecording of the incident available for review. *Id*. at 66. Notably, despite naming potential alibi witnesses in his response to the incident report, Petitioner waived his right to call witnesses during the disciplinary hearing and instead read a written statement. *Id*. at 66-67. Godwin credited the incident report from the female correctional officer and found Petitioner guilty of the offense. *Id*.

Godwin's declaration in this case expands on his disciplinary finding. He explains that the incident occurred at the sallyport which is the entry way into the tier of cells. *Id*. at 10. Prisoners both walk through a metal detector and are pat searched by correctional officers when transiting

6

through the sallyport into their tier. *Id*. Prisoners also present their photo identification card issued by the institution as part of this process so that the inmates entering the tier are properly identified. *Id*. According to Goodwin, any videorecording evidence would not have changed the outcome of the disciplinary hearing because he credited the correctional officer's version of events as she had to identify Petitioner via his identification card. *Id*. Additionally, she would have likely also known the inmates on the tier she worked. *Id*. Thus, Godwin believed there was no chance at misidentification as Petitioner claimed. *Id*. (Goodwin, however, presents no evidence that information from the card reader was ever obtained, which would have been useful evidence to resolve this dispute.)

A prison disciplinary proceeding that results in the revocation of good conduct credit can be challenged via a 28 U.S.C. § 2241 habeas corpus petition. *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973); *Walker v. O'Brien*, 216 F.3d 626, 635 (7th Cir. 2000). A federal prisoner has a liberty interest in his good conduct credit, and so a disciplinary proceeding resulting in the revocation of credit must comport with due process. *Jones v. Cross*, 637 F.3d 841, 845 (7th Cir. 2011). Due process requires the following in a prison disciplinary proceeding: (1) the prisoner must receive written notice of the claimed violation at least 24 hours before the hearing; (2) the opportunity to call witnesses and present documentary evidence (consistent with institutional safety) at the hearing before an impartial decision-maker; and (3) a written statement by the fact-finder of the evidence relied upon and the reasons for the disciplinary action. *Jones*, 637 F.3d at 845 (citing *Wolff v. McDonnell*, 418 U.S. 539 (1974); *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007)). In addition, due process requires the disciplinary decision to be supported by "some evidence."

*Jones*, 637 F.3d at 845 (citing *Superintendent, Mass Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Scruggs*, 485 F.3d at 941).

Petitioner's focus in this case is on the ability to present evidence before an impartial decision maker. "The rule of *Brady v. Maryland*, 373 U.S. 83 (1963), requiring that material exculpatory evidence be disclosed to a criminal defendant, applies in the context of prison disciplinary proceedings." *Jones*, 637 F.3d at 847 (citing *Piggie v. Cotton*, 344 F.3d 674, 678 (7th Cir. 2003)). "[P]rocedural due process required prison officials to disclose all material exculpatory evidence to [Petitioner]." *Jones*, 637 F.3d at 847 (*Scruggs*, 485 F.3d at 939).

This case is similar, but not identical, to *Piggie v. Cotton*, 344 F.3d 674 (7th Cir. 2003). In that case, the disciplinary hearing board had reviewed a videorecording of the incident, but refused to provide the inmate the ability to review the recording, arguing that *Brady* had never been extended to prison disciplinary settings. *Id*. at 677. The Seventh Circuit explained that *Brady* applies and ordered the district court to review the videorecording *in camera* to determine if it contained evidence favorable to the prisoner. *Id*. at 680.

At the outset of this case, the Court ordered the parties to submit the videorecording at issue in an attempt to follow the example from *Piggie*. (Dkt. 15.) No evidence was submitted as Respondent answered that there was no videorecording saved from the incident. Thus, this case, although starting at the same point as *Piggie* of applying *Brady*, is different as Respondent asserts that no videorecording was preserved.

This requires the Court to move to *Arizona v. Youngblood*, 488 U.S. 51 (1988). *Jones v. York*, 34 F.4th 550, 559 (7th Cir. 2022) ("While both *Brady* and *Youngblood* protect exculpatory evidence, *Youngblood* focuses on its preservation, whereas *Brady* focuses on its delivery.").

*Youngblood* holds that "the destruction of potentially exculpatory evidence is not a denial of due process of law unless it is done in bad faith." *Armstrong v. Daily*, 786 F.3d 529, 546 (7th Cir. 2015). To show a due process violation under *Youngblood*, Petitioner must demonstrate: "'(1) bad faith by the government, (2) that the exculpatory nature of the evidence was apparent before its destruction, and (3) that he could not obtain the same evidence anywhere else.'" *United States v. Cherry*, 920 F.3d 1126, 1140 (7th Cir. 2019) (quoting *United States v. Fletcher*, 634 F.3d 395, 407 (7th Cir. 2011)). "Bad faith, in turn, requires proof of an 'official animus' or a 'conscious effort to suppress exculpatory evidence,' and necessarily turns on an official's subjective knowledge that the evidence in question had exculpatory value at the time it was lost or destroyed." *Cherry*, 920 F.3d at 1140 (quoting *United States v. Bell*, 819 F.3d 310, 318 (7th Cir. 2016); *Jones v. McCaughtry*, 965 F.3d 473, 477 (7th Cir. 1992)). The Court must afford a "presumption of honesty and integrity" to the decision maker. *Piggie*, 342 F.3d at 666 (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). (This case certainly tests that presumption.)

A review of the record raises significant questions regarding bad faith, but that, by itself, is insufficient for Petitioner to meet the requirements under *Youngblood* to demonstrate a due process violation. As to bad faith, as discussed above, Program Statement 5270.09 sets forth a 72-hour timeline for the issuance of the incident report, appointment of the investigating official, and issuing of his results. It is true that the program statement says this timeline is the "ordinary" course, but does not mandate it, and equally a violation of a program statement, by itself, does not demonstrate a due process violation. *Chambers v. Ciolli*, No. 20 CV 50135, 2021 WL 4192079, at *4 (N.D. Ill. Sept. 15, 2021).

9

The Court, however, is considering the program statement as it informs the question of whether bad faith occurred. Respondent provides no explanation why the BOP's standard procedure was not followed in this incident. The failure to follow the timeline from the program statement is deeply concerning to the Court. This is especially so when the 24-day period to issue the incident report went beyond the 14-day videorecording retention period.

Another fact concerning the Court is that the incident report is a total of one page long and consists of a one paragraph narrative. (Dkt. 24, pg. 71.) The paragraph is a total of seven sentences. *Id*. The program statement suggests this report should have been written immediately before the investigation. But, even if the incident report is not issued until the completion of the investigation, the Court questions why this took 24 days to complete a one-page form and associated investigation. In sum, this situation does not pass the "smell test." As Colonel Potter of the M*A*S*H 4077 might say, "Horse Hockey!"

If resolution of this claim hinged on the question of bad faith, the Court would be inclined to appoint counsel for Petitioner, allow discovery, and hold an evidentiary hearing. But, further consideration of bad faith is not necessary in this case as even if Petitioner could hypothetically demonstrate bad faith, he cannot meet *Youngblood's* third requirement that he could not obtain comparable evidence from an alternative source. *Cherry*, 920 F.3d at 1140; *California v. Trombetta*, 467 U.S. 479, 489 (1984) (explaining that the destroyed evidence must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.").

Petitioner suggests alternative sources of evidence beyond the videorecording that could have supported his position that he was not present in the sallyport at the time of the incident.

10

(Dkt. 24, pg. 72.) He mentioned two possible alibi witnesses who he claimed were with him away from the tier at the time of the incident. *Id*. The incident also involved a prisoner transfer through the sallyport. The other inmates who were moved along with the other correctional officers during that period could have testified to whether Petitioner was absent as he claimed. Finally, Petitioner also claims there was an electronic record from his identification card whenever he went through the metal detector at the sallyport. *Id*. In sum, there was alternative evidence of multiple witnesses and electronic data available beyond any videorecording and so Petitioner cannot demonstrate a due process violation regarding the failure to preserve the videorecording. *See Bell*, 819 F.3d at 318. His claim as to Incident 973889 is denied.[7]

---

[7] Respondent notes that Godwin relied on the female correctional officer's incident report and, according to Respondent, that means that any potential videorecording is irrelevant. This argument conflates two different principles. Respondent's argument goes to a review of the weight of the evidence considered by the disciplinary hearing decision maker. In reviewing the weight of the evidence supporting the ruling, the Court applies a lenient "some evidence" standard. *Jones*, 673 F.3d at 845. Petitioner's claim, however, invokes a different facet of due process --- his ability to have allegedly exculpatory evidence preserved for his hearing. But, as explained above, there is no due process concern on Petitioner's *Youngblood* claim.

Additionally, Petitioner argues in his briefing before this Court that he requested the videorecording earlier than January 31st. He claims he first requested it on the day of the incident, January 7th, and then on January 16th. (Dkt. 25, pg. 3.) Petitioner, however, provides no potential evidence, beyond his own testimony, such as a copy of a submitted request form, in support of his assertion in his brief that he sought the videorecording before January 31st. Regardless, the question of when Petitioner first sought the videorecording is ultimately irrelevant because, as explained above, he cannot demonstrate that "he could not obtain the same evidence anywhere else." *Cherry*, 920 F.3d at 1140.

**Incident 1053558[8]**

Petitioner's second claim regarding incident 1053558 raises the same issue regarding the failure to allegedly turn over a videorecording of the incident. However, this claim is even easier to resolve than the first one.

This incident also occurred at USP Victorville, on June 14, 2020, at 4:30 p.m. (Dkt. 17, pgs. 66, 70.) A correctional officer conducting rounds walked by Petitioner's cell when he noticed that Petitioner's cellmate showed signs of injuries on his face consistent with a physical altercation. *Id*. at 66. Both Petitioner and his cellmate were removed from the cell and separated. *Id*. The men were taken to the prison infirmary where they were examined separately. *Id*. Petitioner had no signs of injury while his cellmate had multiple puncture wounds to his torso and right arm requiring him to be sent to a local hospital outside the prison for treatment. *Id*. The cellmate informed medical staff that Petitioner stabbed him with an ice-pick style weapon, and he had trouble breathing. *Id*. A search of Petitioner's possessions did not discover the purported weapon. *Id*.

Photographs were taken of Petitioner and his cellmate. Petitioner was photographed from his shoulders up and did not show any injuries. *Id*. The cellmate's photographs showed the following injuries: (1) a large laceration from his mid-eyebrow to the corner of his left eye; (2) several puncture wounds in his torso; (3) puncture wound to his upper right bicep; (4) puncture wound to his left wrist; and (5) puncture wounds to his back. *Id*. Petitioner's staff representative

---

8 Respondent refers to this incident as 3415865. (Dkt. 17, pg. 9.)

12

at the disciplinary hearing stated that Petitioner had "advised him that the altercation was mutual." *Id*.

Petitioner's instant claim argues that the disciplinary board failed to disclose a videorecording of the camera in his prison cell regarding the incident. Like the prior case, he claims the officers allegedly delayed in providing him the incident reports and this delay allowed for the deletion of any videorecordings. Godwin, who was the hearing officer for Petitioner's disciplinary hearing for this second incident as well, provides a declaration stating there was no videorecording to disclose because there was no camera in Petitioner's cell. (Dkt. 17, pg. 29.)

Unlike the first incident involving the sexual harassment of the correctional officer, the instant incident has no claim of mistaken identity. There is no question that Petitioner was in the cell with the victim. Importantly, Petitioner claimed at the disciplinary hearing that the incident was "mutual" combat. *Id*. at 66. The fact the victim had numerous injuries, while Petitioner had none, belies the "mutual" nature of the incident. And, more fundamentally, prisoners have no right to engage in any type of violence against each other. *Gevas v. McLaughlin*, 798 F.3d 475, 484 (7th Cir. 2015) (citations omitted) ("Prisoners lack even a right to invoke self-defense in disciplinary proceedings when they have resorted to violence as a means of protecting themselves."). Any potential videorecording of the incident would not be exculpatory to Petitioner and the alleged failure to preserve or disclose any videorecording does not implicate constitutional

concerns. *Jones*, 637 F.3d at 848. Petitioner's claim regarding Incident 1053558 is denied.[9] The habeas corpus petition is denied on the merits.

Petitioner is advised that this is a final decision ending his case in this Court. If he wishes to appeal, he must file a notice of appeal with this Court within sixty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1)(B)(iii). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if he wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

---

9 Respondent also argues that the claim regarding Incident 1053558 should be dismissed because Petitioner failed to exhaust his claims through the proper prison grievance process. Respondent recognizes that Petitioner argues that he experienced difficulties attempting to raise his claim through the grievance process but argues that these difficulties are insufficient to excuse him from the exhaustion process. The Court need not resolve that question as the underlying claim is meritless.

The habeas corpus petition [1] is denied on the merits. Any pending motions are moot. The Clerk shall enter a Rule 58 judgment in favor of Respondent and against Petitioner. Civil case terminated.

ENTERED:

Dated: January 3, 2024

IAIN D. JOHNSTON
United States District Judge